14 F.3d 594
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
GANS & PUGH ASSOCIATES, INCORPORATED, Plaintiff-Appellant,
v.
TECHNICAL COMMUNICATIONS CORPORATION, Defendant-Appellee.
Gans & Pugh Associates, Incorporated, Plaintiff-Appellee,
v.
Technical Communications Corporation, Defendant-Appellant.
 Nos. 93-1215, 93-1313.
 United States Court of Appeals,
Fourth Circuit.
 Argued: Oct. 26, 1993.
Decided: Dec. 9, 1993.
 
 Appeals from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CA-92-912-A)
 William Joseph H. Smith, Washington, D.C., for appellant.
 Anthony M. Moccia, Boston, MA, for appellee.
 Before HAMILTON, Circuit Judge, CHAPMAN, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 This case involves appellant's attempt to recover unpaid commissions under a sales representative contract that appellee terminated. The district court granted summary judgment against appellant's claim that the contract was terminated in bad faith and, at the conclusion of the trial, entered judgment in favor of appellant in the amount of $ 79,599 because the contract's plain meaning required appellee to pay commissions on sales in its territory that were not specifically exempted. We affirm.
 
 I.
 
 2
 Gans & Pugh Associates, Inc. ("Gans & Pugh"), appellant, represents manufacturers who do not have local sales and marketing presence in the mid-Atlantic region. Technical Communications Corporation ("TCC"), appellee, is a Massachusetts corporation that designs, manufactures and markets communication systems and data encryption devices for security purposes.
 
 
 3
 Beginning in 1985, Gans & Pugh entered into several sales representative contracts with TCC for the purpose of marketing a number of TCC's products in Delaware, Maryland, Southeast Pennsylvania, Virginia, and Washington, D.C. One of the targeted customers in this market was the General Services Administration ("GSA") of the Federal Government.
 
 
 4
 In 1989, the parties negotiated a new sales representative agreement ("the 1990 Contract"), which superseded and replaced the previous agreements. Either party could terminate the agreement upon six month's notice; however, termination would "not void liability of TCC with respect to orders and contracts accepted by TCC prior to the effective termination from the payment of commission thereon." The commission provision of the agreement provided that
 
 
 5
 The Representative will receive a commission of ten (10) percent of the F.O.B. price on orders booked in his territory except as described in Paragraph VII-D and Paragraph D below.
 
 
 6
 The 1990 Contract expanded Gans & Pugh's representation of TCC's products to include data encryption equipment. On one occasion in 1990, Gans & Pugh accompanied TCC to meet with GSA in support of the sales effort. Gans & Pugh also talked with TCC at various times about the sale to GSA and made follow-up calls to GSA. In late 1990, TCC met with GSA separately regarding the sale. Eventually, GSA issued a notice in the Commerce Business Daily stating that it was seeking to negotiate the purchase of data encryption equipment with TCC.
 
 
 7
 After this notice, Gans & Pugh contended it should receive a commission pursuant to the sales agreement, whereas, TCC contended that Gans & Pugh should receive no commission from the GSA sale. On June 10, 1991, TCC advised Gans & Pugh that it intended to terminate the 1990 Contract as of December 31, 1991. TCC signed the contract with GSA on April 21, 1992.
 
 
 8
 The district court granted partial summary judgment against Gans & Pugh's claim that TCC terminated the employment contract in bad faith and found that the termination was in accordance with its terms and, therefore, Gans & Pugh was not entitled to commissions arising from the GSA contract. Gans & Pugh appeals this judgment contending that the district court improperly applied Massachusetts law.
 
 
 9
 At the conclusion of the evidence on appellant's claim for breach of contract, the district court found no issue of material fact in dispute and entered judgment in its favor in the amount of $ 79,599 pursuant to Federal Rule of Civil Procedure 50. TCC appeals this decision on the ground that a material issue of fact existed as to the interpretation of the 1990 Contract.
 
 II.
 
 10
 Gans & Pugh contends that TCC terminated the contract to avoid paying commissions on orders placed by GSA, thus violating an implied covenant of good faith and fair dealing to which the parties were bound under Massachusetts law. "Where commissions are to be paid for work performed by the employee, the employer's decision to terminate its at will employee should be made in good faith." Fortune v. National Cash Register Company, 364 N.E.2d 1251, 1256-7 (Mass.1977); RLM Associates, Inc. v. Carter Manufacturing Corp., 248 N.E.2d 646 (Mass.1969). This implied covenant of good faith and fair dealing is present in all contracts. Fortune, 364 N.E.2d at 125657.
 
 
 11
 However, the holding in Fortune does not apply to the facts of this case. The contract in Fortune did not have an express provision applicable to the manner in which commissions would be paid on orders accepted before termination. See Fortune, 364 N.E.2d at 1251-54. Instead, the contract governed the salesperson's right to commissions independently of termination. Fortune, 364 N.E.2d at 1253; see Balzer/Wolf Associates, Inc. v. Parlex Corp, 753 F.2d 771, 774 (9th Cir.1985).
 
 
 12
 Here, the parties contemplated and agreed that termination could occur upon notice and if termination should occur, TCC would pay Gans & Pugh commissions on orders accepted by TCC before the termination. Ignoring this provision and implying a covenant of good faith and fair dealing would deprive the parties of their bargain and would be contrary to Massachusetts law. Beal v. Stimpson Terminal Company, 305 N.E.2d 863, 864-65 (Mass.App.1974); Forte v. Caruso, 146 N.E.2d 501, 504 (Mass.1957) (cases holding that the plain words are to be given their plain meaning where no inconsistency results or there is no controlling indication in the instrument of other intent). Therefore, because the contract is unambiguous, in the absence of unconscionability or illegality, Massachusetts law requires the enforcement of the contract as written. Balzer/Wolf, 753 F.2d at 774 quoting Zarum v. Brass Mill Materials Corp., 134 N.E.2d 141, 143 (Mass.1956).
 
 III.
 
 13
 TCC argues that the 1990 Contract is not an exclusive commissions contract and that Gans & Pugh is not entitled to commissions on sales of TCC's products unless it participated in the sales. Where there is no ambiguity in the contract, it must be enforced according to its terms. Freelander v. G. & K Realty Corp., 258 N.E.2d 786, 787 (Mass.1970); Sherman v. Employers' Liab. Assur. Corp., 178 N.E.2d 864, 866 (Mass.1961). Relying on Bump v. Robbins, 509 N.E.2d 12 (Mass.App.1987), TCC argues that Massachusetts cases are uniform in holding that exclusive brokerage agreements must unambiguously indicate such an intent for an exclusive brokerage agreement to exist. However, to indicate an intent, the court in Bump, merely required the offeree to assent in "the manner called for by the offer, that is, by signing in the space designated for his signature, or by expressly responding in any other way." Id. at 18.
 
 
 14
 Here, the parties signed the contract indicating their assent and the language of the contract is explicit: TCC must pay Gans & Pugh a commission on orders booked in its territory unless excluded in another provision. Thus, the district court properly entered judgment in favor of Gans & Pugh in the amount of $ 79,599 and properly denied TCC's motion under Rule 50 of the Federal Rules of Civil Procedure.
 
 
 15
 AFFIRMED.